IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JAMES E. CAINE,                    )
                                   )
     Plaintiff,                    )
                                   )
     v.                            )   CASE NO. 2:20-CV-661-RAH-CSC
                                   )
WARDEN BUTLER, et al.,             )
                                   )
     Defendants.                   )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.    INTRODUCTION

Plaintiff James Caine filed this *pro se* 42 U.S.C. § 1983 action. *See* Docs. 1, 2. Thereafter, Plaintiff filed an Amended Complaint, which became the operative pleading in this action. Doc. 8. The Amended Complaint names as defendants Ventress Correctional Facility Warden Reosha Butler, Easterling Correctional Facility Warden John Crow, former Alabama Department of Corrections ("ADOC") Commissioner Jefferson Dunn[1], Assistant ADOC Commissioner Cheryl Price,[2] Wexford Health Administrator Celeste Hunter, Wexford Program Director Peggy Minyard, and Wexford Health Sources, Inc. Doc. 8 at 1, 2. It alleges that, in June 2020, inmates who tested positive for COVID-19 were transferred from Easterling to Ventress, where Plaintiff is and was confined. *Id*. at 2,

---

[1] John Hamm  has replaced Jefferson Dunn as the Commissioner of the Alabama Department of Corrections. Thus, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Hamm is automatically substituted as defendant in his official capacity. Former ADOC Commissioner Jefferson Dunn remains a defendant in his individual capacity. The Clerk is DIRECTED to update the docket sheet and caption accordingly.

[2] Misspelled in the Complaint and on the docket as "Sherry Price."

4. Although Plaintiff had not contracted COVID-19 at the time this action was filed, he claims "the transfer of the COVID 19 patients [] made [Ventress] a very unsafe place." *Id*. at 8. Based on these allegations, Plaintiff purports to bring an Eighth Amendment deliberate indifference claim and Fourteenth Amendment equal protection claim[3] against Defendants. For relief, he seeks monetary damages; for the Court to "tell Warden Butler to be more careful next time[] and call the (CDC) if anyone tries to put a virus in her camp;" and for the Court to tell Warden Crow "not to release anyone for transfer that has a serious disease or virus that could cause death in another camp."[4] *Id*. at 6; *see also* Docs. 39, 40.

On October 23, 2020, the Court issued an Order directing Defendants to file a Special Report addressing Plaintiff's claims (Doc. 10), which Defendants did on November 13, 2020 (Doc. 27) and December 4, 2020 (Doc. 31).[5] In their Special Reports, Defendants move for summary judgment or dismissal and provide evidentiary materials in support. *See* Doc. 27 at 27; Doc. 31. After reviewing the Special Reports, the court issued an Order on February 10, 2021, requiring Plaintiff to respond to the reports and other filings with

---

[3] Throughout the Amended Complaint, Plaintiff maintains that his Eighth and Fourteenth Amendment rights have been violated by Defendants' conduct. *See generally* Doc. 8. He also states that the Fourteenth Amendment "gives [him] the right to the equal protection of the law." *Id*. at 8. Thus, the Court will treat Plaintiff's *pro se* pleading liberally and, in an abundance of caution, construe it as attempting to state a Fourteenth Amendment equal protection claim in addition to an Eighth Amendment deliberate indifference claim.

[4] Plaintiff also sought a preliminary injunction "for the state to send all the COVID-19 patients back to the camp they came from, and not to send more [to Ventress]." Doc. 8 at 5. However, Plaintiff's motion for a preliminary injunction was denied prior to this Recommendation. *See* Docs. 36, 38. And because Caine is no longer incarcerated (*see* Doc. 45), his requests for injunctive relief are moot. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979).

[5] Defendants Hunter, Minyard, and Wexford Health Sources, Inc., filed a separate Special Report from the other Defendants.

affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 35. This Order specifically cautioned that the "court may at any time [after expiration of the time for Plaintiff to file a response] and without further notice to the parties (1) treat the [special] reports, … and all supporting evidentiary materials as motions for summary judgment, and (2) after considering any response …, rule on the dispositive motions in accordance with the law." Doc. 35 at 3. Plaintiff responded. *See* Docs. 34, 37. Pursuant to the February 10, 2021, Order, the court now treats Defendants' Special Reports as motions for summary judgment and concludes the motions are due to be granted.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party … . [A fact] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has satisfied that burden, the nonmovant is required to cite portions of the record showing a genuine dispute of material fact.  *Id*. at 324. The nonmovant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S.

574, 586 (1986). To establish a genuine dispute of material fact, the nonmovant must produce evidence such that a reasonable trier of fact could return a verdict in its favor. *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

In determining whether a genuine dispute of material fact exists, the court must view all the evidence in a light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmovant's favor. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see also* Fed. R. Civ. P. 56(a). Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Summary judgment also should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.   RELEVANT FACTS[6]

The following facts derive from Plaintiff's verified Amended Complaint (Doc. 8) and the sworn or verified evidentiary materials proffered by Defendants (Doc. 27-1 through 27-5; Doc. 28-1 through 28-5; Doc. 29-1; Doc. 30-1 through 30-4). Although Plaintiff also

---

[6] The "facts" set forth herein are merely for purposes of resolving summary judgment and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) ("[W]hat we state as 'facts' … for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.").

filed responses to Defendants' filings (Docs. 34, 37), the Court cannot consider the allegations therein in deciding summary judgment because the responses are neither sworn nor properly verified in accordance with 28 U.S.C. § 1746.[7]

As noted above, the Amended Complaint provides that, in June 2020, inmates who tested positive for COVID-19 were transferred from Easterling to Ventress, where Plaintiff is and was confined. Doc. 8 at 2, 4. He claims that "the transfer of the COVID 19 patients here made [Ventress] a very unsafe place." *Id*. at 8. He makes the following allegations as to the following Defendants.[8]

> As to Warden Butler, Plaintiff states:
>
> After Warden Butler got here, she has done everything in her power to make this a safe place. She has got the inmate on inmate violence way down, she also does everything in her power to treat everyone equal no matter who you are. With this said, I doubt she ok[ay]ed the COVID 19 patients in her camp. This means someone over her head done this transfer for some illegal act.
>
> But the ones that did transfer the COVID 19 patients to Ventress did put me at a[n] unreasonable risk of harm or death.
>
> Warden Butler should have called the (CDC) or the Health Department. She should have never let it in her camp.

---

[7] *See, e.g., Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) (*citing Carr v. Tatangelo*, 338 F.3d 1259, 1273 n. 26 (11th Cir. 2003), *as amended*, (Sept. 29, 2003) (noting that "[u]nsworn statements may not be considered by a district court in evaluating a motion for summary judgment."); *McCaskill v. Ray*, 279 F. App'x 913, 915 (11th Cir. 2008) (holding that district court should not have considered unsworn and unverified allegation in deciding summary judgment); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) (noting that omission of the phrase "under penalty of perjury" would "allow[] the affiant to circumvent the penalties for perjury in signing onto intentional falsehoods"); *Grupo Rayco C.A. v. Delta Air Lines, Inc.*, No. 1:20-CV-1952, 2021 WL 1351859, at *9 n. 3 (N.D. Ga. Mar. 16, 2021) ("By omitting the requisite language stating that the certification was made 'under penalty of perjury,' counsel has failed to substantially comply with [§ 1746].").

[8] Other than naming Peggy Minyard, Ruth Naglich, and Wexford Health Sources, Inc., as defendants, Plaintiff does not assert any specific allegations against these parties.

*Id*. at 7.

As to Warden John Crow, Plaintiff states:

The Warden at Easterling [] knew she/he was transferring positive COVID 19 patients to Ventress [] which was COVID 19 free. Did violate my 8th and 14th Amend. … and has put me in an unreasonable risk of serious harm or death. Thus, she/he has created a very unsafe condition for me to live in and thus falls under the 8th Amendment of cruel and unusual punishment.

*Id*. at 4.

As to former Commissioner Dunn, Plaintiff states:

[Commissioner] Dunn did knowingly and willfully violate my constitutional rights under the 8th and 14th Amendments . . . through his willful negligence of transferring the positive tested COVID 19 patients from Easterling . . . to a COVID 19 free camp, Ventress . . . where I am [].

. . . Dunn's actions of negligence that he knew w[ere] illegal . . . but he did it anyway, without taking any reasonable care, which is a part of his duty in protecting and keeping the prisons safe to the best of his ability[;] not to deliberately spread a deadly disease throughout the [] prison. [] He did not take any reasonable care in his actions.

*Id*. at 8.

As to Assistant Commissioner Cheryl Price, Plaintiff states:

Assistant Prison Commissioner [] Price [] did violate my 8th Amendment right . . . for she knew the coronavirus is a serious disease that has caused a great harm and death throughout the world, and it is a serious disease.

[She] is the one that signs for any and all transfers in D.O.C. She knew what she was doing with her deliberate spread of the COVID 19 disease that would expose me to a death sentence.

*Id*. at 10.

Finally, as to Celeste Hunter, Plaintiff states

Celeste Hunter . . . has violated my 8th Amendment under a very deliberate indifference of my health, for they denied me total access to mental health for mental stress . . . and temperature checks.

[] I am in H-Dorm and we have had inmates taken out that tested positive for the  COVID 19 virus. The first day we were put on quarantine we could not get medical to come to our dorm and check our temperature.

*Id*. at 4.

He further states more generally:

[] [Ventress is] so overcrowded that [inmates] sleep less than four feet apart, and [] the temperature in the day get[s] from 98° to 102° in the dorm, and when we go to eat we s[i]t shoulder to shoulder with each other in the dining hall, and this alone makes Ventress  an incubator for growing bacteria and diseases. . . . This camp was not set up to keep the COVID 19 patients that were sent here.

*Id*. at 9. Plaintiff had not contracted COVID-19 at the time he filed this action, but he claims that his dorm was under "lock-down quarantine" which put him at "a very high risk of getting COVID 19 [because he] was trap[p]ed in a full dorm[] with no f[i]ltered air or any type of clean air. . . . They never tested [inmates] for COVID 19." *Id*.

In response, Defendants concede that six inmates who tested positive for COVID-19 were transferred from Easterling to Ventress in or around July 2020. Doc. 29-1 at 3; Doc. 30-3 at 2. However, they aver that these inmates were housed under medical quarantine in a specific, designated location that facilitated medical isolation; the inmates' movements were restricted to prevent them from coming into contact with other inmates; and prison officials have taken, and continue to take, extensive actions to protect inmates and staff from the spread of COVID-19 at Ventress and throughout all ADOC facilities. Doc. 29-1 at 3–4; Doc. 30-3 at 2–3; Doc. 30-4 at 2–3.

In response to the COVID-19 pandemic, the United States Centers for Disease Control and Prevention ("CDC") issued an "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities." Docs. 27-3, 27-4; Docs. 28-4, 28-5. In an effort to prevent or mitigate the introduction and spread of COVID-19 in these facilities, the CDC recommends that a number of steps be taken, including but not limited to:

> (1) restricting or suspending the transfers of detained persons and to subject any transfers to medical isolation to evaluate if COVID-19 testing is appropriate; (2) quarantining all new inmates for 14 days before they enter into the general population; (3) cleaning and disinfecting surfaces that are frequently touched multiple times per day, including the use of disinfectants effective against the virus; (4) providing detainees, at no cost, with soap, running water, and hand drying machines or paper towels; (5) implementing social distancing strategies to increase the physical space between each detained person; and (6) medically isolating confirmed or suspected COVID-19 cases.

*Archilla v. Witte*, No. 4:20-CV-596, 2020 WL 2513648, at *3 (N.D. Ala. May 15, 2020). The CDC's Guidance is subject to adaptation for specific institutional settings "based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Doc. 27-3 at 2; Doc. 28-4 at 2.

Defendants maintain that they follow the CDC's guidelines, from both a medical and security perspective, and contend that they have taken numerous steps to combat the spread of COVID-19 through ADOC facilities. Doc. 29-1 at 4; Doc. 30 at 6–12. Specifically, they provide evidence of the following:

> From the outset of the pandemic in March 2020, ADOC worked to create and implement a plan to respond to the COVID-19 pandemic, both system wide and at Ventress. [Doc. 30-1 at ¶ 7; Doc. 30-3 at ¶ 6]. ADOC focused its efforts on operational preparedness, education, increased cleaning and

disinfection of facilities, screening, restriction of movement into facilities, and securing and distributing hygiene, cleaning, and medical supplies. [Doc. 30-1at ¶ 7; Doc. 30-3 at ¶ 6]. Additionally, ADOC created specific local teams identified as Pandemic Planning Teams at a facility level to implement protective measures to mitigate inmate and staff exposure. [Doc. 30-1 1at ¶ 7].

[] Beginning in early March 2020, recognizing the threat of COVID-19, ADOC developed a plan of action to combat the spread of COVID-19 and to protect the inmates and staff. As part of ADOC's efforts to reduce the spread of COVID-19, it initiated an education and communication strategy directed to both staff and inmates. [Doc. 30-1 at ¶ 8; Doc. 30-3 at ¶ 6]. These communications consisted of documents and information developed by ADOC's Office of Health Services ("OHS") and the CDC. [*Id.*]. The materials provide basic information on COVID-19, such as what it is, how it spreads, and the common symptoms. [*Id.*]. Additionally, the documents describe the best methods for protecting oneself and how to help prevent the spread of the virus. [*Id.*]. These measures include proper hygiene practices, identifying the signs and symptoms of COVID-19, social distancing, and identifying methods for addressing stress associated with the virus. [*Id.*].

[] In addition to educating staff and inmates, ADOC has taken a number of proactive steps to curb the spread of COVID-19. ADOC, consistent with CDC Guidance, temporarily suspended new intakes[9] and modified the intake process. [Doc. 30-1 at ¶ 9; Doc. 30-3 at ¶ 6]. Additionally, ADOC suspended all outside visitors from entering any facility, and implemented a screening procedure prior transferring inmates between ADOC facilities. [Doc. 30-1 at ¶ 9; Doc. 30-3 at ¶ 6].

For staff, ADOC implemented a pre-work screening procedure and a process for employees who call-in sick. [Doc. 30-1 at ¶ 9; Doc. 30-3 at ¶ 6]. Prior to entering the facility, officers must answer a series of questions and have their temperature checked. [*Id.*]. If an officer calls in with an illness, the officer must respond to specific screening questions, and each facility must maintain a log to track all illness related absences. [Doc. 30-1 at ¶ 10].

To provide for a clean environment, ADOC resourced and provided to all facilities, including Ventress, cleaning supplies with instructions for cleaning the facilities and a specific checklist for cleaning kitchens. [Doc. 30-1 at ¶

---

9 ADOC temporarily halted new intakes on March 20, 2020 for a minimum of 30 days to allow it to create an intake procedure that will allow for a 14-day quarantine to help prevent infected inmates from being introduced into the population. [Doc. 30-1 at ¶¶ 9, 14, 15, 18].

11; Doc. 30-3 at ¶ 6]. ADOC acquired and distributed facemasks for officers and inmates. [Doc. 30-1 at ¶ 12; Doc. 30-3 at ¶ 8]. The facemasks provided to inmates include instructions for care and cleaning of the masks, and a written acknowledgment form signed by the inmate acknowledging receipt or refusal of the masks. [Doc. 30-1 at ¶ 12; Doc. 30-3 at ¶ 6].

[] In addition to specific movement restrictions, education, and staffing restrictions, ADOC created and implemented protocols for testing inmates suspected of being COVID-19 positive, and quarantining and medically isolating inmates directly exposed to or testing positive for COVID-19. Decisions on whether to test an inmate rests with medical personnel based upon criteria developed by ADOC from CDC Guidance, and in coordination with the three (3) level quarantine protocol.

Quarantine and testing occur based on a three (3) tiered system. [Doc. 30-1 at ¶ 18]. Level one, also known as "watchful wait," requires inmates suspected of exposure to a COVID-19 positive person to be isolated from the general population and monitored for fever and other symptoms of COVID-19. Level one does not require testing. [*Id.*]. Level two requires an inmate who exhibits signs or symptoms of COVID-19 or has confirmed prolonged direct exposure to a person who has tested positive to be isolated and tested for COVID-19. [*Id.*]. Level three requires medical quarantine for any inmate who tests positive for COVID-19. [*Id.*].

In an effort to provide medical care and operate in a reasonable and efficient manner, ADOC established a medical quarantine area at Ventress to accommodate several facilities. [Doc. 30-3 at ¶ 5]. Inmates, including inmates from Easterling Correctional Facility, have been and will be transferred to Ventress for medical quarantine. [Doc. 30-3 at ¶ 5; Declaration of Celeste Hunter [Doc. 29-1 at 3]]. The location within the Ventress grounds allowed ADOC to maintain separation of the COVID-19 positive inmates from the general population, and provide necessary medical care for infected inmates. [Doc. 30-3 at ¶ 5; Declaration of Dr. John Peasant [Doc. 30-4 at 2–3]; Doc. No. 28-1 at 3]. Inmates in the medical quarantine area must remain in the specific location. [Doc. 30-3 at ¶ 5]. ADOC provides all necessary services, including meals and medical care, to the inmates within the medical quarantine area. [Doc. 30-3 at ¶ 5]. No other inmates, including Plaintiff, have or ever had access to medical quarantine area or inmates within the quarantine area. [*Id.*].

[] While ADOC's administration and OHS have worked tirelessly to curb the spread of COVID-19 system-wide, Warden Butler and Ventress staff

engaged in the fight on the frontlines. [Doc. 30-3 at ¶ 6]. Warden Butler, supported by Naglich, stated that she and her staff have conducted or oversaw the following preventative actions and measures at Ventress:

a. educating inmates and staff through oral and written communications, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;

b. encouraging inmates and staff to engage in proper hygiene practices and social distancing;

c. providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing;[]

d. continuing medical appointments such as chronic care clinics and sick-call appointments;

e. suspending copays for inmates seeking medical services;

f. implementing intensified cleaning and disinfecting procedures;

g. suspending the intake of new inmates and, when restarted, ensuring an appropriate quarantine and screening before transferring the new intakes from a temporary intake facility to a permanent intake facility;

h. performing verbal screening and temperature checks for all persons entering the facility and, if a person has a temperature over 100.4 degrees Fahrenheit or other symptoms of COVID-19, denying the person entry into the facility;

i. implementing social distancing strategies;

j. providing masks to each inmate (and a replacement if these initial masks are misplaced or destroyed), along with instructions on wearing, cleaning, and caring for the masks;

k. providing masks and gloves to administrative and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;

l. implementing a quarantine or medical isolation plan for any inmate or staff who tests positive for COVID-19 or is suspected of having or being exposed to COVID-19;

11

    m. monitoring inmates for symptoms of COVID-19 such as cough and shortness of breath or at least two (2) of fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell; and

    n. testing inmates for COVID-19 with symptoms of COVID-19 or contact with a person testing positive for or suspected of having COVID-19.

[Doc. 30-1 at ¶ 17; Doc. 30-3 at ¶ 6].[]

To provide a clean environment, Warden Butler established a cleaning schedule that requires all surfaces, including bathrooms and living areas, to be cleaned and sanitized at least two (2) times per shift, for a total of six (6) cleanings per day. [Doc. 30-3 at ¶ 7]. In addition, Warden Butler implemented social distancing measures at Ventress, suspending congregational services, prohibiting religious and educational personnel from entering the facility, and requiring inmates to maintain at least six (6) feet distance while standing in line for meals, phones, or any other matter. [*Id.* at ¶ 8]. These efforts are on top of the system-wide restrictions that began in March 2020, suspending all outside work in the community, and all visitation. [Doc. 30-3 at ¶ 6].

ADOC Officials['] tireless efforts continue to keep the spread of COVID-19 contained at Ventress. As of December 1, 2020, only seventeen (17) total inmates have tested positive for COVID-19 since March 2020, and no COVID-19 positive inmate cases remained. [Doc. 30-4 at 3]. Additionally, twenty-four (24) officers have tested positive since the beginning of the pandemic, and only one (1) staff member remained under self-quarantine as of December 1, 2020. [Doc. 30-3 at ¶ 9].

Doc. 30 at 6–12.

Defendants argue that no evidence has been presented that Plaintiff's medical needs have been delayed or denied at any time. *See* Doc. 27; *see also* Doc. 29-1, Doc. 30-4. Dr. John Peasant testifies that:

Inmates are tested for COVID-19 for three separate reasons[:]

a.  Symptoms such as fever, headache, congestion, shortness of breath, cough, loss of taste or smell, or GI symptoms. The medical provider makes the decision to test these patients.

b.  Patients who are scheduled to go for an off-site appointment or procedure are tested at the request of the off-site provider.

c.  Patients are tested when the decision is made from the OHS to conduct mass testing.

Patients who test positive for COVID-19 are placed in medical isolation. Single cells are used until they are filled to capacity. Once that happens arrangements are made for the positive patients to be held in an area separate from other inmates.

A medical isolation unit was established at Ventress to assist with providing care to patients who test positive for COVID-19. This area was separated from the general inmate population, and efforts were made to ensure that medical staff attending to patients in the medical isolation area did not contaminate or spread the virus to the general inmate population.

Patients who test positive for COVID-19 are screened daily for worsening of symptoms and treated accordingly. This is accomplished by nursing and medical provider assessment. Treatment is based on symptoms and can include medications such as OTC medications (Tylenol, Guaifenesin), or antibiotics, inhalers, as indicated.

If the patient's symptoms cannot be managed on-site, they are sent to the free world ER for evaluation and treatment.

If the patient's symptoms cannot be managed on-site, they are sent to the free world ER for evaluation and treatment.

Doc. 30-4 at 2–3. However, at the time this action was filed, Plaintiff had not received a COVID-19 test because he never exhibited any signs or symptoms of COVID-19. Doc. 27-5 at 2; Doc. 29-1 at 3. Moreover, as to Plaintiff's allegation that he was denied "total access to mental health for mental stress" (Doc. 8 at 4), Defendant Butler avers that mental health services remained ongoing at Ventress during the relevant time period. Doc. 30-3 at 5.

Mental health staff saw inmates if they submitted written requests for mental health care or treatment or if they were referred for mental health services. *Id.* Plaintiff's medical records do not reflect that he submitted any requests for mental health care or treatment prior to filing this action. *See* Doc. 28-2 at 1–30; *see also* Doc. 29-1.

## IV.   DISCUSSION

### A.   Sovereign Immunity

Plaintiff seeks damages on his claims for relief. Doc. 8 at 6; *see also* Docs. 43, 44. Defendants Dunn, Price, Crow, and Butler assert Plaintiff's suit against them, to the extent they are sued in their official capacities, is barred by the Eleventh Amendment immunity.[10] Doc. 31 at 10–11.

Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). A state official thus may not be sued in his or her official capacity unless the State has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity, *see Seminole Tribe of Fla. v. Fla.*,

---

[10] Defendants Hunter, Minyard and Wexford also assert the defenses of sovereign and qualified immunity. Doc. 20 at 3. Defendants Hunter and Minyard work for Wexford Health Sources, Inc., a private prison healthcare contractor. Doc. 27-5 at 2–3; Doc. 29-1 at 2. The decision in *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir.1999), *amended*, 205 F.3d 1264 (11th Cir. 2000), forecloses these defendants' qualified immunity argument. In *Hinson*, the Eleventh Circuit relied upon the reasoning of *Richardson v. McKnight*, 521 U.S. 399 (1997), where the Supreme Court declined to extend qualified immunity to privately employed prison guards, to hold that qualified immunity may not be extended to privately employed prison physicians. Based upon *Hinson*, Defendants Hunter, Minyard, and Wexford cannot claim the protection of qualified immunity. In addition, for similar reasons that the *Hinson* and *Richardson* courts declined to extend the doctrine of qualified immunity, Defendants Hunter, Minyard, and Wexford are not entitled to sovereign immunity as such is reserved for the State and its employees.

517 U.S. 44, 59 (1996). "Alabama has not waived its Eleventh Amendment immunity in §

1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir.

2017) (*citing Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990)); *see*

*also* Ala. Const. Art. I, § 14. Thus, to the extent Plaintiff sues Defendants Dunn, Price,

Crow, and Butler in their official capacities, he is not entitled to relief because as state

actors they are entitled to sovereign immunity under the Eleventh Amendment for claims

seeking monetary damages. *Selensky*, 619 F. App'x at 849; *Jackson v. Georgia Dep't of*

*Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994).

### B.   Qualified Immunity

As to Plaintiff's claims against Defendants Dunn, Price, Crow, and Butler in their

individual capacities, qualified immunity offers complete protection from civil damages

for government officials sued in their individual capacities if the underlying conduct does

not violate "clearly established statutory or constitutional rights of which a reasonable

person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against

liability but immunity from suit, and the Supreme Court "repeatedly [has] stressed the

importance of resolving immunity questions at the earliest possible stage in litigation."

*Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (quotation marks and citation omitted).

To receive qualified immunity, a defendant first must prove that he or she was acting

within the scope of discretionary authority when the allegedly wrongful acts occurred. *Lee*

*v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). The record here establishes beyond

dispute that Defendants Dunn, Price, Crow, and Butler were acting within the course and

scope of their discretionary authority when the challenged conduct occurred.  The burden therefore shifts to Plaintiff to present evidence that these defendants are not entitled to qualified immunity. *See, e.g., Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To meet such burden, Plaintiff must show two things: (1) that the defendants committed a constitutional violation and (2) that the constitutional right the defendants violated was "clearly established." *Id.*; *see also Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. ... In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations and quotation marks omitted) (alteration in original). The court may analyze the elements "in whatever order is deemed most appropriate for the case," and a finding of qualified immunity is appropriate if sufficient evidence has not been presented as to any one of the elements. *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241-42).

### C.    Deliberate Indifference

#### a.    Plaintiff is not entitled to compensatory or punitive damages.

As an initial matter, Plaintiff seeks more than $900,000 in monetary damages. Doc. 8 at 6; Doc. 43. However, the Prison Litigation Reform Act provides that a prisoner may not bring an action "for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)." 42 U.S.C. § 1997e(e). Plaintiff has neither alleged nor provided any

evidence of a physical injury stemming from the events described in the Amended Complaint or a sexual act as defined in 18 U.S.C. § 2246(2). *See generally* Docs. 8, 43 (providing that he suffered "risk" and "fear" of harm, but no actual physical harm). Therefore, even if Plaintiff were to successfully demonstrate a violation of a constitutional right, he would not be entitled to compensatory or punitive damages; at most, he would be entitled to nominal damages, *see Logan v. Hall*, 604 F. App'x 838, 840 (11th Cir. 2015), which typically amount to $1.00, *see Quainoo v. City of Huntsville, Ala.*, 611 F. App'x 953, 955 (11th Cir. 2015) (defining nominal damages as $1 or $100); *Bailey v. Williams*, No. 3:18-CV-739, 2019 WL 2269833, at *4 n. 6 (M.D. Fla. May 28, 2019) ("[N]ominal damages are limited to a mere token or trivial sum, typically $1.00."); *Whitfield v. Thompson*, 165 F. Supp. 3d 1227, 1238 n. 4 (S.D. Fla. 2016) ("[N]ominal damages do not generally exceed one dollar.").

###### b. Plaintiff has failed to establish a genuine issue of material fact as to an Eighth Amendment deliberate indifference claim.

Prison officials have a duty under the Eighth Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). A prison official may be held liable under the Eighth Amendment for acting with "'deliberate indifference'" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm"

and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828.

To survive summary judgment on a conditions of confinement claim, a plaintiff must satisfy both an objective and subjective inquiry. *See id*. at 834; *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (holding that the law requires establishment of both objective and subjective elements to demonstrate an Eighth Amendment violation). Under the objective component, the plaintiff must demonstrate "a substantial risk of serious harm." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015) (citation omitted). In *Swain v. Junior*, the Eleventh Circuit acknowledged "that the risk of COVID-19 satisfies this requirement." 961 F.3d 1276, 1285 (11th Cir. 2020). Under the subjective component, the plaintiff must prove "the defendants' deliberate indifference" to that risk of harm by making three sub-showings: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Id*. (citation omitted).

Defendants appear to acknowledge "subjective knowledge" of the risk posed by COVID-19. *See, e.g.,* Doc. 31 at 5 ("ADOC Officials recognized the danger created by COVID-19.").Therefore, Plaintiff's claim hinges on whether any Defendant disregarded that risk by conduct that is more than mere negligence. *See Swain*, 961 F.3d at 1285; *Helling v. McKinney*, 509 U.S. 25, 35–36 (1993) (holding that a plaintiff may state an Eighth Amendment claim against prison officials based upon conditions that "pose an unreasonable risk of serious damage to his future health" if he shows "he himself is being exposed" to that potential health risk and that "prison authorities are ignoring the possible

dangers posed by exposure"). The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id*.

In *Swain*, the Eleventh Circuit addressed the deliberate indifference standard as it applies to the management of COVID-19 in a prison setting. The Court stated:

> [E]ven while the district court seemed to assume a state of affairs in which the defendants had taken numerous measures to combat the virus, it held that the defendants were nonetheless deliberately indifferent based on two considerations: (1) the increase in the rate of infections . . . and (2) the lack—and seeming impossibility—of meaningful social distancing at the facility. In so concluding, the district court erred. Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839–40 . . . (quotation omitted).
>
> First, and most obviously, the district court erred in relying on the increased rate of infection. On this point, the Supreme Court's decision in *Farmer* couldn't be any clearer: "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*." *Id*. at 844 . . . (emphasis added). A resulting harm thus cannot alone establish a culpable state of mind. *Cf. Wilson v. Seiter*, 501 U.S. 294, 303 . . . (1991) (stating that "the 'wantonness' of conduct" doesn't "depend[] upon its effect upon the prisoner"); *Wilson v. Williams*, [961 F.3d 829, 842–43 (6th Cir. 2020)] (rejecting the contention that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19").
>
> Second, and separately, the district court erred in concluding that the defendants' inability to ensure adequate social distancing constituted deliberate indifference. The court stated no less than eight times in its order that adequate social distancing was "not possible" or "impossible." [] [However,] [f]ailing to do the "impossible" doesn't evince indifference, let alone deliberate indifference.

*Id.* at 1287. Upon finding that failure to stop the spread of COVID-19 and failure to

adequately social distance does not amount to deliberate indifference, the Court then turned

to the measures taken by the defendants to mitigate the spread of the virus:

> [T]he [court-commissioned expert] report observed that the defendants put "tape on the floor to encourage social distancing in lines," that "bunks are staggered with head to foot configuration" in order to maximize the distance between faces during sleep, and that "[p]atients are staggered and appropriately distanced when going to medical." Importantly, we think, while the report noted some social-distancing violations, it concluded that [the facility's] administrators and employees were "doing their best balancing social distancing and regulation applicable to the facility," and that they "should be commended for their commitment to protect the staff and the inmates." It's worth noting, though not determinative, that the CDC's guidance—on which the district court relied heavily—presupposes that some modification of its social-distancing recommendations will be necessary in institutional settings. The guidance states in bold-face type, on the very first page, that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Regarding social distancing specifically, it says that while there should "ideally" be six feet between inmates, "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff," and that "[n]ot all strategies will be feasible in all facilities." It therefore offers "strategies with varying levels of intensity," such as—importantly here, because the defendants claimed to have done so—"[a]rrang[ing] bunks so that individuals sleep head to foot to increase the distance between them."

> Moreover, the defendants have represented that they took numerous *other* measures—besides social distancing—to mitigate the spread of the virus. The district court summarized a few of them:

> - "requiring staff and inmates to wear face masks at all times (other than when sleeping)";
> - "conducting screening for all staff entering the facility";
> - "conducting daily temperature screenings for all inmates";
> - "suspending all outside visitation"; and
> - "providing disinfecting and hygiene supplies to all inmates."

> [] The court assumed, for the sake of its deliberate-indifference analysis, at least, that the defendants had implemented these measures, but nonetheless concluded, as a matter of law, that they must have been inadequate because

(1) the rate of infections rose and (2) social distancing—which it took to be the most critical measure—wasn't possible.[]

*Id*. at 1288–89 (citations to the record omitted). Finally, the Court held:

Whatever deliberate indifference is, the defendants' conduct here doesn't show it. The district court erred in holding that the defendants acted with a deliberately indifferent mental state, equivalent to "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839–40 . . . . We simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by "doing their best." Because the defendants "act[ed] reasonably," they "cannot be found liable" under the Eighth Amendment.

*Id*. at 1289.

Like in *Swain*, the undersigned finds that Defendants' conduct in this case does not rise to the level of deliberate indifference. Defendants have provided substantial evidence detailing the numerous steps prison authorities have taken to mitigate the spread of COVID-19 throughout the prison system and, specifically, at Ventress. Without repeating each of those steps, which are provided in detail above, Defendants have demonstrated that they have taken significant measures to implement precautions to protect Plaintiff and other inmates from the virus as recommended by the CDC, including—but certainly not limited to—restricting the six inmates transferred from Easterling to medical quarantine in a designated area wholly isolated from other inmates. *See* Doc. 29-1; Doc. 30-3. Plaintiff has failed to refute Defendants' evidence with anything more than broad, conclusory assertions that Defendants acted unreasonably by the mere act of transferring COVID-positive inmates from Easterling to Ventress. *See generally* Doc. 8; see also *Ellis*, 432 F.3d at 1326

("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

The Court is acutely cognizant of the serious nature of COVID-19, particularly at the time this action was filed, when the virus was still novel to and rampant throughout the United States. The Court further empathizes with Plaintiff's wish for conditions, such as social distancing, more conducive to mitigating the spread of the virus throughout the prison system. However, there is simply nothing in the record to suggest that Defendants acted less than reasonably given the limitations with which they were faced. Like the Eleventh Circuit in *Swain*, this Court "simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their best.'" *Swain*, 961 F.3d at 1289.

Moreover, Plaintiff has failed to establish a genuine issue of material fact as to his claim that Defendant Hunter denied him medical care. Plaintiff vaguely alleges that Defendant Hunter denied him "access to mental health for mental stress" and denied him temperature checks. Doc. 8 at 4. Plaintiff fails to provide any further detail regarding his first allegation, such as when he may have sought treatment, from whom, or how or why such treatment was denied. Additionally, there is no evidence Plaintiff sought or requested mental health care or treatment prior to filing this action. Doc. 27-1; Doc. 28-2. Accordingly, his bare allegation of being denied "access to mental health," without more, is insufficient to overcome summary judgment. *See Ellis*, 432 F.3d at 1326.

As to Plaintiff's second allegation, that he did not receive regular temperature checks, he fails to identify any specific individual from whom he sought medical care—much less that he sought care from Defendant Hunter—or provide any allegations or evidence that he required medical care during the relevant time period. Indeed, the undisputed evidence demonstrates that an inmate's temperature will be checked in one of three circumstances—if the inmate develops symptoms of COVID-19, if the inmate goes off-site for an appointment or procedure, or if the decision is made from the OHS to conduct mass testing. Doc. 30-4 at 2. The evidence further demonstrates that Plaintiff never exhibited any signs or symptoms of COVID-19 or contracted COVID-19 prior to this action (Doc. 27-5 at 2; Doc. 29-1 at 4), and Plaintiff does not allege that either of the other two circumstances were applicable in that instance. Thus, Plaintiff's bare allegations regarding denied medical care wholly fail to establish deliberate indifference by Defendant Hunter.

Accordingly, because Plaintiff has failed to make a showing of deliberate indifference by Defendants Dunn, Price, Crow, and Butler, they are entitled to qualified immunity and their motion for summary judgment on Plaintiff's purported Eighth Amendment deliberate indifference claims is due to granted. Because Plaintiff has also failed to make a showing of deliberate indifference by Defendants Hunter, Minyard, and Wexford Health Sources, Inc., their motion for summary judgment on Plaintiff's purported Eighth Amendment deliberate indifference claims is likewise due to be granted.

**D.     Equal Protection**

**i.     Plaintiff has failed to establish a genuine issue of material fact as to a Fourteenth Amendment equal protection claim.**

Finally, construing Plaintiff's *pro se* pleading liberally, it appears he also purports to bring a Fourteenth Amendment equal protection claim based on Defendants' conduct in transferring COVID-positive inmates to Ventress. To the extent Plaintiff intends to establish such a claim, he has wholly failed to do so. To overcome summary judgment on an equal protection claim, Plaintiff must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on race, religion, national origin, or some other constitutionally protected basis. *Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001). Plaintiff has done neither. He has neither alleged nor provided any evidence of the existence of any similarly situated prisoners who received more favorable treatment than him or that he was somehow discriminated against based on a constitutionally protected basis. Accordingly, Defendants Dunn, Price, Crow, and Butler are entitled to qualified immunity and their motion for summary judgment on Plaintiff's purported Fourteenth Amendment equal protection claims is due to granted. The motion for summary judgment filed by Defendants Hunter, Minyard, and Wexford Health Sources, Inc., on Plaintiff's purported Fourteenth Amendment equal protection claims is likewise due to be granted.

## V.    CONCLUSION

Based on the foregoing, the undersigned RECOMMENDS that:

1.      Defendants' Motions for Summary Judgment (Docs. 27, 31) be GRANTED;

2.      Judgment be ENTERED in favor of Defendants.

3.      This case be DISMISSED with prejudice.

It is further ORDERED that, on or before **August 15, 2023**, the parties may file objections to this Recommendation. The parties must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made. Frivolous, conclusive, or general objections will not be considered. The parties are advised that this Recommendation is not a final order and, therefore, is not appealable.

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except on grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH Cir. R. 3-1. *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Done, this 1st day of August 2023.

/s/  Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE